UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------- X
                              :

PAUL MCCABE,                    :

                      :

           **Plaintiff,**     :

                      :         **OPINION AND ORDER**

      - against -      :

                      :         **09 Civ. 8617 (SAS)**

CAPITAL MERCURY APPAREL, *et al.*, :

                      :

         **Defendant.**    :

------------------------------------------------- X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

# I.    INTRODUCTION

          Plaintiff Paul McCabe brings this putative class action pursuant to

Sections 404 and 502 of the Employee Retirement Income Security Act

("ERISA"),[1] on behalf of himself and other former vested participants of an

Employee Stock Ownership Plan ("ESOP" or the "Plan") who received a cash

distribution on or about June 2009 (the "Class"), against defendants Capital

Mercury Apparel, Ltd. ("Capital Mercury" or the "Company"), the Capital

Mercury Apparel Administrative Committee (the "Committee"), and John C.

Higdon.  Plaintiff alleges that defendants breached their fiduciary duty to the Class

by applying a year-old valuation of the Company that did not reflect its fair market

---

        [1]      *See* 29 U.S.C. §§ 1109, 1132.

value at the time of the distribution.  Plaintiff and defendants now cross-move for summary judgment on the issue of liability.  For the reasons set forth below, plaintiff's motion is denied and defendants' motion is granted.

## II.   BACKGROUND[2]

### A.   The Parties

Defendant Capital Mercury is an employee-owned company that has "designed and manufactured branded and private label men's and women's clothes for over forty years."[3]  Plaintiff and the proposed Class are former Capital Mercury employees who participated in the ESOP and held stock worth less than one thousand dollars at the time they received their distributions in or around June 2009.[4]  Defendant Committee is the "named fiduciary" legally responsible for the administration of the ESOP under ERISA.[5]  Defendant Higdon served as the sole

---

[2]     The facts summarized in this section are drawn from materials submitted by the parties in connection with this cross-motion, and are undisputed unless otherwise noted.  Where the same fact is asserted or admitted by both plaintiff and defendants, only one source is noted.

[3]     Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Def. 56.1") ¶ 4.  *Accord id.* ¶ 5.

[4]     *See* Plaintiff's Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Pl. 56.1") ¶¶ 22-27.

[5]     29 U.S.C. § 1102(a)(1) ("Every employee benefit plan shall . . . provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan.").

member of the Committee during the relevant Class period,[6] and is the current

President, Chief Executive Officer ("CEO"), and Chief Financial Officer ("CFO")

of Capital Mercury.[7]

## B.   ESOP Structure and Distributions

ESOP is a defined contribution plan under ERISA, with holdings

primarily comprised of Capital Mercury stock ("Company Stock").[8]   Company

employees are automatically enrolled in the Plan upon completion of 160 hours of

_____

*Accord* Def. 56.1 ¶¶ 11-16.

[6]      Higdon has been the sole member of the Committee since November 2006, when its three other members resigned for reasons unknown to the Court. *See* Def. 56.1 ¶ 17. *See also* Pl. 56.1 ¶ 2.   While the Board of Directors ("Board") attempted to appoint Higdon's administrative assistant to the Committee in December 2006, she declined to participate. *See* Def. 56.1 ¶ 20.   Because ESOP directs the Committee to "choose from its members a Chair and a Secretary," Higdon serves in both these posts.   ESOP, Ex. 1 to Def. 56.1 at 28.   *Accord* Pl. 56.1 at ¶¶ 4-5.

[7]      *See* Def. 56.1 ¶ 1.   Higdon assumed the President and CEO positions around December 2006.   He has been the CFO of the Company since the early 1990s, and has served on the Board since 1996.   *See id.* ¶¶ 1-3, 116.   Jonathan Brainin and Sam DiPrima were the other directors of Capital Mercury during the relevant time period.   *See* June 3, 2010 Deposition of John C. Higdon ("Higdon Dep."), Ex. 5 to Def. 56.1 at 102:02-104:09.

[8]      *See* Def. 56.1 ¶¶ 5-6.

3

paid service,[9] and are credited annually with their share of Company Stock.[10]

Participants[11] are furnished with an annual statement reflecting the balance in their

accounts as of the beginning of the Plan year, as well as the number of shares of

Company Stock allocated to their accounts and the "Fair Market Value"[12]

of the stock as of that "Allocation Date."[13]  The Fair Market Value of Company

Stock is "determined by the [Plan administrators] for all purposes under the Plan

based upon a valuation by an independent appraiser."[14]  The Allocation Date is

---

[9]      *See* Capital-Mercury Shirt Corporation Employee Stock Ownership Plan Summary Plan Description ("ESOP SPD"), Ex. 2 to Def. 56.1 at 1.

[10]      *See* ESOP at 12.

[11]      As defined in the Plan, a Participant is "[a]ny Employee or former Employee who has met the applicable eligibility requirements [stated in the Plan] and who has not yet received a complete distribution of his Capital Accumulation." *Id.* at 7.

[12]      Fair Market Value is defined as "the price at which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, and both parties are able, as well as willing, to trade and are well-informed about the asset and the market for such an asset."  October 2008 Houlihan Lokey Draft Valuation Report for Capital Mercury Apparel, Ltd. as of June 30, 2008, Ex. 4 to Def. 56.1 at 201.  *Accord Secretary of Labor Proposed Regulation Relating to the Definition of Adequate Consideration*, 53 Fed. Reg. 17,632, 17,637 (proposed May 17, 1988) (defining Fair Market Value under 29 U.S.C. § 1002(18)(b)).

[13]      ESOP at 16-17.

[14]      *Id.* at 6.

4

defined as "June 30 of each year (the last day of each Plan Year)."[15]

Once Participants "become eligible for a distribution, the value of [the] vested interest in [their] accounts [is] distributed to [them] in the form of Company Stock . . . [which is then] immediately resold to the Company" in return for its equivalent value in cash and promissory notes.[16] Any cash distribution to Participants is "based upon the Fair Market Value of Company Stock as of the Allocation Date immediately preceding the date of distribution."[17] Specifically, Participants are informed that the value of the vested interests in their accounts is determined by the Fair Market Value "as of the June 30 coinciding with or immediately preceding the date of distribution."[18] Where the value of a Participant's Capital Accumulation is under one thousand dollars, the balance is normally distributed following his or her termination of service.[19] If the value of the Participant's Capital Accumulation is over one thousand dollars, the balance may not be distributed before the Participant attains age sixty-five without his or

---

[15]      *Id.* at 4.

[16]      ESOP SPD at  5.

[17]      ESOP at 23.

[18]      ESOP SPD at  5.

[19]      *See* Amendment No. 2, Effective as of March 28, 2005, to ESOP as Amended and Restated as of July 1, 2002 ("ESOP Amendment"), Ex. 1 to Def. 56.1.

her written consent, except in cases of retirement, disability, or death.[20]

ESOP's stated purpose is to "enable participating employees to share in the growth and prosperity of [the Company], to provide Participants with an opportunity to accumulate capital for their future economic security and to enable participants to acquire stock ownership interests in the Company."[21]  Participants are not, however, given "any guarantees that the value of investments, even investments in Company Stock, will increase."[22]  Participants may familiarize themselves with the ESOP's terms by referring to the Summary Plan Description ("SPD"), a document which sets forth its provisions in abbreviated and simplified form.[23]

The Plan is administered by an "Administrative Committee composed of one or more individuals appointed by the Board of Directors."[24]  The powers enjoyed by the Committee include:

> (2) determining the appropriate allocations to Participants' Accounts . . .; (3) determining the amount of benefits

---

[20]    *See id.*

[21]    *Id.* at 2.

[22]    ESOP SPD at  1.

[23]    *See id.* ("This SPD describes the main feature of the Plan in general terms.").

[24]    ESOP at 28.

6

payable to a Participant (or Beneficiary), and the time and manner in which such benefits are to be paid; (4) authorizing and directing all disbursements of Trust Assets by the Trustee; . . . (6) engaging any administrative, legal, accounting, clerical or other services that it may deem appropriate; (7) construing and interpreting the Plan and the Trust Agreement and adopting rules for administration of the Plan that are consistent with the terms of the Plan documents and of ERISA and the Code ; . . . (10) selecting an independent appraiser and determining the Fair Market Value of Company Stock as of such dates as it determines to be necessary or appropriate.[25]

Ultimately, the Committee is to act "solely in the interests of Participants," and is vested with "sole and exclusive authority to construe, interpret and apply the terms of the Plan."[26]

## C.   Annual Valuations of Company Stock

Beginning in the 1990s, pursuant to the dictates of the Plan, the Committee retained Houlihan Lokey as its independent appraiser to determine the Fair Market Value of Company Stock and provide an annual valuation of the Company for each Plan year ending June 30.[27] The usual valuation method, the

---

[25]     *Id.* at 29-30.

[26]     *Id.* at 30. The Plan grants the Committee "the greatest possible deference permitted by law in the exercise of such discretionary authority." *Id.*

[27]     *See* Def. 56.1 ¶ 32. The cost of the valuation was borne by the Plan. *See* ESOP at 30. *See also* Sept. 13, 2010 Supplemental Affidavit of John C. Higdon in Support for Defendants' Opposition to Plaintiff's Cross-Motion for Summary Judgment and Reply in Support of Defendants' Motion for Summary

market and income approach, compared Capital Mercury to publicly traded

companies in the apparel industry.[28] The analysis began with a review of the

Company's audited financial statements for the completed fiscal year.[29] Because

these statements were generally not prepared until August, the valuation was

usually performed between September and November.[30] Houlihan Lokey

traditionally provided the Company with a draft valuation report before submitting

the final version around December or January.[31]

The valuations indicated a steady increase in stock price until June 30,

2001, when a series of poor managerial business decisions and declining industry

performance reversed the Company's fortunes.[32] By the time Higdon assumed the

---

Judgment ("Higdon Aff.") at 2 ("Houlihan Lokey's retainer for preparing the
Valuation of Capital Mercury as of June 30, 2008 was $27,500.").

[28]    *See* Def. 56.1 ¶¶ 48, 50.

[29]    *See* May 26, 2010 Deposition of Todd Strassman ("Strassman Dep."),
Ex. 10 to Def. 56.1 at 137:12-21.

[30]    *See id. See also* Def. 56.1 ¶¶ 41-42.

[31]    *See* Def. 56.1 ¶¶ 37, 41.

[32]    *See id.* ¶¶ 43-53, 55, 57, 60-61 (noting that the Company stock price
was valued at $19.90 per share as of June 30, 1989; $23.77 per share as of June 30,
1993; $22.96 per share as of June 30, 1997; $9.53 per share as of June 30, 2001;
$6.37 per share as of June 30, 2004; $4.23 per share as of June 30, 2005; $1.45 per
share as of June 30, 2006; and $0.36 per share as of June 30, 2007). *See also*
December 2009 Houlihan Lokey Valuation Report for Capital Mercury Apparel,
Ltd. as of June 30, 2009 ("2009 Valuation Report"), Ex. 14 to Def. 56.1 at 17.

position of CEO in December 2006, Capital Mercury was in "rather dire stra[its]."[33] The 2008 global economic crisis exacerbated the Company's "serious financial distress" as retail sales declined and credit lines dried up.[34] It was evident that the Company "would not be able to continue operations without additional financing," which was not forthcoming.[35] In anticipation of the June 30, 2008 valuation, Higdon informed Houlihan Lokey that he believed that there was an eighty percent chance that the Company would be liquidated during the 2009 fiscal year.[36]

As a consequence of "the Company's likely liquidation, as well as its poor historical performance and uncertainty of positive future performance," Houlihan Lokey determined that the market and income approach was not "likely to result in a meaningful indication of value," and switched to the "adjusted book value approach" ("ABVA") for the June 30, 2008 Valuation.[37] Based on this new methodology, Houlihan Lokey valued the entire Company at sixty-nine thousand

---

[33]   Def. 56.1 ¶ 56.

[34]   *Id.* ¶ 68 (quotation omitted). *Accord id.* ¶¶ 69, 71.

[35]   2009 Valuation Report at 17.

[36]   *See* Pl. 56.1 ¶ 36.

[37]   Def. 56.1 ¶¶ 64-65.

dollars,[38] and Company Stock at $0.015 per share.[39]

### D.    The Sale of Capital Mercury's Assets

Capital Mercury's "rather catastrophic" economic circumstances prompted Higdon to begin exploring options to sell the entire Company around mid-2008.[40] Because some of the Company's assets were "effectively worthless," however, prospective buyers were not interested in buying the entire Company.[41] After surveying the market from at least September 2008 to January 2009, it became clear that "the best value the Company could achieve" was a sale of the majority of its assets — namely, inventory and goodwill — to Paris Accessories, Inc. ("Paris").[42] Capital Mercury communicated its acceptance of Paris's offer in January 2009, and the terms of the deal were finalized in an Asset Purchase Agreement ("APA") on or about May 12, 2009.[43]

---

[38]    *See* Pl. 56.1 ¶ 35.

[39]    *See* Def. 56.1 ¶ 67.

[40]    Def. 56.1 ¶ 70. *Accord id.* ¶¶ 73-77.

[41]    *Id.* ¶ 87. *Accord id.* ¶¶ 78-82.

[42]    *Id.* ¶ 85. *Accord id.* ¶¶ 78-84.

[43]    *See* May 25, 2010 Deposition of Howard Jay Feller ("Feller Dep."), Ex. 8 to Def. 56. 1 at 35:14-15, 45:23-25.  Feller was a partner at Marketing Management Group, the company hired to facilitate the sale of Capital Mercury and/or its assets. *See id.* at 07:25-10:07.

Under the APA,

> Paris agreed to purchase the Company's finished goods
> inventory at F.O.B. cost plus a 5% to 6% commission and
> agreed to purchase raw material inventory used in
> production for F.O.B. cost plus a 5% to 6% commission for
> a period of six months after May 12, 2009. Paris agreed to
> pay a royalty of 1.5% of net sales of dress shirts for a
> period of 18 months and 2.0% of the net sales of sport
> shirts for a period of 24 months.[44]

Capital Mercury was thus due to receive immediate payment for the transfer of its

assets, as well a "percentage of the future sale of [its] business for a defined period

of time."[45]   The Company expected to "have revenue from Paris to be paid out

over the next two years."[46]  As of June 30, 2009, the Company's finished and raw

goods inventory was collectively valued at $4,830,859.[47]  The projected royalties

from the transaction were anticipated to be $770,040 for the first year, with

$731,875 in royalties due to Capital Mercury for the period of May 2009 through

December 2009.[48]

    Following the transaction with Paris, "Capital Mercury continued to

---

[44]    Pl. 56.1 ¶ 12.

[45]    Feller Dep. at 47:21-47:24.

[46]    Pl. 56.1 ¶ 13.

[47]    *See id.* ¶ 18.

[48]    *See id.* ¶¶ 20-21.

exist as a corporate entity[, but] . . . other than winding down its affairs and shipping out some remaining inventory . . . it was a dramatically different company."[49]  It was "transition[ing] out of the apparel business and into an operational state more similar to a holding company, owning few particular assets including joint venture assets and real estate assets."[50]  Capital Mercury's financial statements indicated that "the Company's account[s] receivable balance decreased $8.8 million from $11.3 million as of June 30, 2008 to $2.6 million as of June 30, 2009 . . . [and] the Company's inventory balance decreased $12.5 million from $17.0 million as of June 30, 2008 to $4.5 million as of June 30, 2009."[51]  The Company anticipated "ceas[ing] operations and fil[ing] for bankruptcy upon expiration of the royalty payments from Paris."[52]  Consequently, following the sale, the Board was primarily concerned with liquidating or transferring the Company's remaining assets, as well as helping its employees find new jobs.[53]  The only currently remaining employees of the Company are its three Board members —

---

[49]     Feller Dep. at 47:05-47:14.

[50]     2009 Valuation Report at 18.

[51]     *Id.* at 19.

[52]     *Id.* at 39.

[53]     *See, e.g.*, May 27, 2010 Deposition of Sam DiPrima, Ex. 7 to Def. 56.1 at 14:13-33:19.

12

Higdon, Brainin, and DiPrima.[54]

### E.   Termination of Class Members' Interests in ESOP

In connection with the APA, the majority of Company employees were terminated and therefore deemed inactive for ESOP purposes.[55]  Higdon, as the sole Committee member, "made the decision to distribute the shares to the Inactive Employees" around mid-March 2009.[56]  Because "the ESOP plan requires that the last valuation be used in repurchasing shares, and June 30, 2008 had been the last valuation," the Committee set the distribution rate as $0.015 per share, the Fair Market Value on June 30, 2008.[57]  Moreover, based on his "knowledge of the company [and . . .] the economic climate [and . . .] of having worked with

---

[54]    *See* Def. 56.1 ¶ 97.

[55]    *See* Pl. 56.1 ¶¶ 22-23.

[56]    Pl. 56.1 ¶ 31.  *Accord* Def. 56.1 ¶ 98.  The reasons for the distribution to the Class are in dispute, and are not considered for purposes of deciding this motion.  Plaintiff argues that "the decision to make these distributions was motivated by the intent to reduce the number of Company shares outstanding . . . and therefore provide defendant Higdon with a larger percentage of future earnings, profits and distributions resulting from the sale of these assets" to Paris.  Plaintiff's Reply to Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1 ¶ 99.   Defendants allege that the distributions were made in an attempt to minimize future administrative costs of the Plan since "the management of an ESOP Plan with so any inactive employees, [and] small amounts, was onerous going forward."  Def. 56.1 ¶ 99.

[57]    Pl. 56.1 ¶¶ 24-28.

13

Houlihan Lokey for over a decade [and . . .] the general sense of having been a
CFO in the company for over two decades," it was Higdon's position that the year-
old valuation remained an accurate representation of the Company's financial
condition at the time of the distribution, so that another valuation was not
required.[58]

In early June 2009, inactive employees with ESOP account balances
of less than one thousand dollars were notified by mail that their shares of
Company Stock would be distributed and then immediately resold back to the
Company for $0.015 per share, as determined by the Fair Market Value on June
30, 2008.[59] The Company completed the purchase of inactive employees' shares
by enclosing a check with the value of their vested benefit.[60] Specifically, Plaintiff

---

[58]   Higdon Dep. at 102:02-104:09 ("[B]ased on my knowledge of where I
was at that moment in time and what my belief was of how Houlihan would value
the company, I believed the values were similar and did not require another
valuation."). Because he felt that "[n]o one [else] would be as qualified" to
determine whether the Houlihan Lokey valuation as of June 30, 2008 fairly valued
Capital Mercury as of June 30, 2009, Higdon did not confer with Houlihan Lokey
"in connection with [his] decision to use the June 2008 Valuation to value the
Inactive Employees' shares of Company common stock in June 2009." *Id.* at
87:02-06, 105:03-13.

[59]   *See* Pl. 56.1 ¶¶ 24-28. Although the distribution decision was made in
March, the "time [required] to prepare the paperwork for so many participants"
delayed its implementation until June. Higdon Dep. at 79:09-79:11.

[60]   *See, e.g.*, June 1, 2009 Capital Mercury Letter and Enclosed Check to
Paul F. McCabe ("McCabe Distribution"), Ex. 12 to Def. 56.1.

received his distribution by letter dated June 1, 2009, in the amount of $560.58, as based on his 36431.7261 shares of Company Stock.[61]

### F.    The 2009 Valuation and Plaintiff's Claim

On August 6, 2009, Houlihan Lokey was retained to perform the June 2009 valuation for Capital Mercury.[62]  In conducting its assessment of the Company's Fair Market Value, Houlihan Lokey "considered the assets and liabilities of the Company in light of the sale of its apparel operations" and anticipated future operating cash flow, as based on representations of management.[63]  Given its continuing "operational difficulties," the ABVA was once again determined to be "the most appropriate valuation approach for the Company."[64]

The ABVA indicated that the Company's equity value was *negative* $1.438 per share and therefore speculative.[65]  Upon receipt of the draft report from Houlihan Lokey, Higdon objected to the valuation, believing that it was "not

---

[61]    *See id.*

[62]    *See* Pl. 56.1 ¶¶ 56-57.

[63]    Pl. 56.1 ¶ 61.  *Accord id.* ¶ 62.  Houlihan Lokey accepted Capital Mercury's representations regarding its operations and financial condition without independent verification.  *See id.* ¶ 63.

[64]    June 2009 Valuation Report at 42.

[65]    *See id.* (emphasis added).

15

appropriate for Capital Mercury since [it] was still in business."[66] Houlihan Lokey

agreed that the Company retained some option value while it was still operating,

and reconsidered the valuation.[67]

The discrepancy between the zero value generated by the ABVA and

the positive value Houlihan Lokey surmised a hypothetical buyer might pay for

Capital Mercury assets was attributed to the exclusion of certain variables from

ABVA calculations.[68]  Namely, the present cash flow associated with the "earn out,

the royalty stream, the rental income . . . and the expense structure" necessary to

operate the business was not "picked up in the adjusted book value estimate."[69]

Houlihan Lokey thus employed an additional methodology — the Black-Scholes

option analysis — to more accurately value the equity of the Company.[70]  Relying

on these two complementary evaluation measures, Houlihan Lokey's final

valuation report, issued in or around December 2009, indicated the Fair Market

---

[66]      Higdon Dep. at 150:23-151:02.

[67]      *See* Strassman Dep.at 115:18-117:17.  *See also*  2009 Valuation
Report at 42 ("Although the adjusted book value approach results in negative
equity value, the Company's equity may still have option value based on the
remaining assets held and the future operating cash flows from the Company's
limited operations.").

[68]      *See* Strassman Dep. at 108:17-109:05; 140:07-19.

[69]      *Id.*

[70]      *See id.* at 115:18-117:17.

Value of Company Stock to be within a range of zero to $0.259 per share.[71]

Houlihan Lokey would "not give a valuation between the two [figures] and

[expressed] comfort[] with giving two values," thereby leaving it up to the

Committee to "determine the fair market value of Capital Mercury using the

Houlihan report as a basis."[72]  In early 2010, ESOP participants were informed that

the Company Stock was valued at $0.13 per share, the midpoint between the two

potential values, as of June 30, 2009.[73]

      Plaintiff argues that an independent appraisal of the Fair Market Value

of the Company should have been performed when the Class's ESOP interests

were terminated.  Plaintiff asserts that the Houlihan Lokey valuation as of June 30,

2008 undervalued the Company as of June 2009, and that he and others similarly

situated were thus deprived of a fair return for their stock shares.  Consequently,

plaintiff argues that Higdon, the Committee, and Capital Mercury violated their

fiduciary responsibilities under ERISA.

## III.  APPLICABLE LAW

### A.    Summary Judgment

---

[71]     *See* June 2009 Valuation Report at 43.

[72]     Higdon Dep. at 185:05-10.

[73]     *See* Pl. 56.1 ¶ 59.

Courts routinely grant summary judgment in breach of fiduciary duty cases brought pursuant to ERISA.[74] Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[75] "'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law.'"[76] "[T]he burden of demonstrating that no material fact exists lies with the moving party . . . ."[77] In determining whether a genuine issue of material fact exists, the court must "constru[e] the evidence in the light most favorable to the non-moving party and draw all reasonable inferences" in that party's favor.[78] "The standard to be applied when deciding cross-motions for summary judgment is the same as that for individual motions for summary judgment and the court must consider each

---

[74]    *See, e.g.*, *Warren Pearl Constr. Corp. v. Guardian Life Ins. Co. of Am.*, 639 F. Supp. 2d 371, 383 (S.D.N.Y. 2007) (granting defendant's summary judgment motion on plaintiff's ERISA breach of fiduciary duty claim); *Lisa v. Smith*, 991 F. Supp. 2d 289, 298 (S.D.N.Y. 2004) (same, for plaintiff).

[75]    Fed. R. Civ. P. 56(c).

[76]    *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 34 (2d Cir. 2008)).

[77]    *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008).

[78]    *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009).

18

motion independent of the other."[79]

## B.   Fiduciary Duty under ERISA

ESOPs are subject to ERISA, which "is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans."[80]  Consequently, decisions pertaining to the governance of such plans must "be made with an eye single to the interests of the participants and beneficiaries."[81]  Plan administrators and trustees "have fiduciary obligations that have been described as 'the highest known to the law.'"[82]  "[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or . . . management or disposition of its assets . . . or [(ii)] he has any discretionary authority or responsibility in the administration of such plan."[83]

Section 404(a) of ERISA sets out the basic obligations of fiduciaries acting in connection with an ERISA benefits plan.  *First*, ERISA "charges

---

[79]     *Schultz v. Stoner*, 308 F. Supp. 2d 289, 298 (S.D.N.Y. 2004).

[80]     *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983).

[81]     *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982) (describing the "complete loyalty" fiduciaries owe to ERISA plan participants).

[82]     *Flanigan v. General Elec. Co.*, 242 F.3d 78, 86  (2d Cir. 2001) (quoting *Donovan*, 680 F.2d at 272 n.8).

[83]     29 U.S.C.A. § 100?(21)(A).

19

fiduciaries with a duty of loyalty to guarantee beneficiaries' interests."[84]  Thus, an

ERISA fiduciary must act "solely in the interest of the participants and

beneficiaries [of the plan] and for the exclusive purpose of providing benefits [to

them] and defraying reasonable expenses of administering the plan."[85]  Because

ERISA's primary goal of "protecting employees' expectations of . . . benefits"[86]

can only be met if the interests of Plan administrators are subordinated to those of

Participants, the duty of loyalty is perhaps ERISA's "most fundamental" fiduciary

obligation.[87]

     *Second*, ERISA imposes a duty of care[88] upon fiduciaries, whereby

fiduciaries must exercise "the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent [person] acting in a like capacity and

--------

[84]    *Pegram v. Herdrich*, 530 U.S. 211, 224 (2000) (tracing ERISA's fundamental fiduciary duty of loyalty to its roots in the common-law context of trusts).

[85]    29 U.S.C. § 1104(a)(1)(A)(i)(ii).

[86]    *Bell v. Pfizer*, No. 07 Civ. 5390, 2010 WL 3385949, at *12 (2d Cir. Aug. 30, 2010) (citation and quotation omitted).

[87]    *Pegram*, 530 U.S. at 224 (citation and quotation omitted).

[88]    In legal parlance, the duty of care is alternatively referred to as the duty of prudence. *See, e.g.*, *F.W. Webb Co. v. State Street Bank and Trust Co.*, No. 09 Civ. 1241, 2010 WL 3219284, at *11 (S.D.N.Y. Aug. 12, 2010) (observing that courts have interpreted the statutory requirements imposed on ERISA fiduciaries as creating "both a duty of loyalty and a duty of prudence").  I use the terms interchangeably here.

familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . ."[89]  In this regard, "the standard by which [a fiduciary's] conduct must be judged is essentially one of reasonableness."[90]  Courts must evaluate whether, "at the time [he or she] engaged in the challenged transactions," that fiduciary discharged his or her duties in an "objectively reasonable manner according to the standards of others similarly situated."[91]

 *Finally*, ERISA requires that fiduciaries act in accordance with plan documents and instruments insofar as those documents and instruments are consistent with the relevant provisions of the statute.[92]  "Thus, while failure to follow plan documents may constitute a breach of fiduciary duty, compliance with the terms of the plan does not, by itself, satisfy ERISA imperatives."[93]

 To establish a breach of fiduciary duty under ERISA, a plaintiff must demonstrate "some causal link between the alleged breach of [the fiduciary's]

---

[89]    29 U.S.C. §§ 1104(a)(1)(B)-(C).

[90]    *Pineiro v. Pension Benefit Guar. Corp.*, 318 F. Supp. 2d 67, 91 (S.D.N.Y. 2003).

[91]    *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984) (quotations and citations omitted).

[92]    *See* 29 U.S.C. § 1104(a)(D).

[93]    *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 474 (S.D.N.Y. 2005) (citations omitted).

duties and the loss plaintiff seeks to recover."[94]  If a fiduciary is found to have

breached the obligations imposed by ERISA, he or she is liable to restore any

losses to the plan that resulted from each breach, and may also be subject to any

equitable or remedial relief that the court deems appropriate.[95]

## IV.  DISCUSSION

Each party contends, on the basis of divergent views of facts material

to the dispute, that the case is ripe for summary judgment in its favor.  Plaintiff

argues that defendants breached their fiduciary duty under ERISA, on the grounds

that "a prudent ERISA fiduciary would not have terminated Class members'

interest in the ESOP in June 2009 without first determining the fair market value of

the company as of the termination date."[96]  Defendants respond that they complied

with their ERISA obligations because they acted "in accordance with the

documents and instruments governing the plan" and for the permissible purpose of

---

[94]     *Silverman v. Mutual Benefit Life Ins.*, 138 F.3d 98, 104 (2d Cir. 1998).

[95]     *See* 29 U.S.C. § 1109(a).  Section 502 of ERISA sets forth a civil
enforcement scheme, allowing plan participants to bring actions arising from an
employer's fiduciary breach. *See id.* § 1132. *See also Varity Corp. v. Howe*, 516
U.S. 489, 507-15 (1996) (elaborating on Section 502).

[96]     Plaintiff's Memorandum of Law in Support of His Cross-Motion for
Summary Judgment and in Opposition to Defendants' Motion for Summary
Judgment ("Pl. Mem.") at 5.

reducing administrative costs associated with the Plan.[97]

I evaluate, in turn, defendants' compliance with the distinct fiduciary duties imposed by ERISA: (1) the duty to follow Plan provisions; (2) the duty of prudence; and (3) the duty of loyalty.[98]

## A.    Duty to Follow Plan Provisions

### 1.    Plan Provisions Pertaining to Distributions

""As part of the 'prudent [person]' standard of care imposed by the statute, plan fiduciaries are required to perform their duties 'in accordance with the documents and instruments governing the plan.'"[99]  The timing and manner of Capital Mercury ESOP distributions are governed by Sections 11 and 12 of the Plan, respectively.[100]  Under Section 11, Participants with vested accounts worth less than one thousand dollars will "normally [receive their capital accumulations]

---

[97]    Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Def. Mem.") at 7 (citation and quotation omitted).

[98]    *See Ello v. Singh*, 531 F. Supp. 2d 552, 563 (S.D.N.Y. 2007) (listing exclusive purpose,  prudence, and acting in accordance with the plan as the affirmative duties set forth by Section 404 of ERISA).

[99]    *Schultz*, 308 F. Supp. 2d at 303 (quoting 29 U.S.C. § 1104(a)(2)).

[100]    Section 11 is entitled, "When Capital Accumulation Will Be Distributed."  ESOP at 20.  Section 12 is entitled, "How Capital Accumulation Will Be Distributed."  *Id.* at 23.

23

following the termination of service."[101]  In contrast, Participants with vested

accounts worth more than one thousand dollars must first consent to the

distribution, unless they are over age sixty-five.[102]  Because plaintiff and the

putative Class Members fell into the former category, defendants' unilateral

decision to distribute their interests in June 2008 was consistent with the terms of

the Plan.

Section 12 explains how capital accumulations will be distributed.[103]

Specifically, "[a]ny distribution in cash shall be based upon the Fair Market Value

of Company Stock as of the Allocation Date immediately *preceding* the date of

distribution."[104]  In laymen's terms, the SDP instructs employees that, "[i]n

determining the value of your vested interest in your Accounts, the shares of

Company Stock held therein are valued at the fair market value as of the June 30

*coinciding with or immediately preceding* the date of distribution."[105]  The decision

to distribute ESOP shares to inactive employees with less than one thousand

dollars in their accounts was made in or around mid-March, and implemented in

---

[101]  *Id.* at 20.

[102]  *See id.*

[103]  *See id.* at 23.

[104]  *Id.* (emphasis added).

[105]  ESOP SPD at  5 (emphasis added).

24

*early* June 2009 (*i.e.*, before June 30) after all the paperwork had been completed. Thus, the Plan not only condoned, but explicitly required, defendants' use of the June 30, 2008 valuation to establish the Fair Market Value of Company Stock at the time of the distribution.

### 2. Plaintiff's Interpretation of the Plan

Perhaps recognizing that "courts have narrowly circumscribed when a plaintiff may sue a fiduciary for adhering to the terms of the governing plan,"[106] plaintiff concedes that defendants adhered to Sections 11 and 12 of the Plan but argues that their reliance on these sections was misplaced. Plaintiff contends that Sections 11 and 12 only govern distributions in "ordinary circumstances," and that defendants were required to conduct a new valuation prior to cashing out the Class's interest in the ESOP under the two properly controlling Plan provisions for "extraordinary events."[107]

---

[106]   *In re Polaroid ERISA Litig.*, 362 F. Supp. at 474.

[107]   Pl. Mem. at 23. Plaintiff's summary judgment brief conclusively asserts, without explanation, that "defendants did not act in accordance with the Plan Document" because "a prudent person would not have applied [Sections 11 and 12] of the Plan under the circumstances then prevailing." *Id.* at 20, 21. In order to distill plaintiff's argument, I referred to his pre-motion submissions for guidance. *See* June 17, 2010 Plaintiff's Letter to the Court Seeking Leave to File for Summary Judgment ("6/17/10 Pl. Letter"); June 25, 2010 Plaintiff's Letter to the Court Replying to Defendants' Intended Summary Judgment Motion ("6/25/10 Pl. Rep. Letter").

As a general matter, plaintiff's variant application of Sections 11 and 12 is unsubstantiated by either fact or logic. It is well-settled that "[u]nambiguous language in an ERISA plan is to be interpreted and enforced in accordance with its plain meaning."[108] The distinction between ordinary and extraordinary circumstances does not appear anywhere in the Plan or the SPD, and plaintiff does not cite any authority whatsoever to support his claim that Sections 11 and 12 may be bypassed under extraordinary circumstances. Nor does plaintiff explain how he determined that "ordinary circumstances [are those] where a Plan Participant seeks to sell his ESOP shares to the Company," while "extraordinary circumstances [are those] where the Committee decides to cash out most Plan participants."[109] This omission is particularly glaring in light of the clear option for unilateral distributions set forth in Section 11, through which the Company may cash out Participants at its initiative and without their consent as a matter of "normal[]" course.[110]

Indeed, the language of Sections 11 and 12 of the Plan unequivocally affirms their universal application to all distributions. Section 11 begins by noting

---

[108]    *Perreca v. Gluck*, 295 F. 3d 215, 223 (2d Cir. 2002) (quotation and citation omitted).

[109]    Pl. Mem. at 21.

[110]    ESOP at 21.

26

that "[a] Participant's Capital Accumulation will be distributed at the time and in the manner set forth in [this section]."[111] Section 12 asserts that "*[a]ny* distribution in cash *shall* be based upon the Fair Market Value of Company Stock as of the [June 30] coinciding with or immediately preceding the date of distribution."[112] Accordingly, if the Committee were to ignore the mandates set forth in these sections, and instead use its broad direction to decide when a new valuation is appropriate, it would violate its statutory duty to act "in accordance with the documents and instruments governing the plan."[113] Plaintiff's argument thus nonsensically leaves defendants in a catch-22, exposing them to liability both for complying with the Plan terms and for departing from them.

The two provisions cited by plaintiff do no more to bolster his

---

[111]    *Id.* at 20.

[112]    *Id.* at 23.

[113]    29 U.S.C. § 1104(a)(1)(D). *Accord Ramos v. SEIU Local 74 Welfare Fund*, No. 01 Civ. 2700, 2002 WL 519731, at *4 (S.D.N.Y. Apr. 5, 2002) ("Fiduciaries are required to administer an ERISA plan in accordance with plan documents."). Additionally, plaintiff's recognition of defendants' discretionary authority to interpret and apply the Plan defeats his own argument. "[A] district court must accord deference to the denial of benefits by a fiduciary where the plan document itself grants the fiduciary discretion in applying and interpreting the plan," and may only intervene when the fiduciary has acted arbitrarily or capriciously in construing Plan terms. *Id.* Because plaintiff concedes that Sections 11 and 12 govern distributions as a general principle, defendants could not have acted arbitrarily or capriciously in following their dictates to deny the Class the potential benefits that might have resulted from a new valuation.

27

argument that Sections 11 and 12 did not properly govern the distribution. *First*,

plaintiff excerpts a Plan provision which, he posits, "requires that '[t]he fair market

value of Company Stock, as determined by the [Administrative] Committee for all

purposes under the Plan [be] based upon a valuation by an independent appraiser'"

("FMV Provision").[114]   Plaintiff argues that

> defendant Higdon . . . has admitted that he violated [this
> provision because he . . . ] testified that he did not need an
> independent appraisal in June 2009 in order to inform the
> Administrative Committee as to whether the year-old June
> 2008 independent appraisal fairly valued the Company as
> of June 2009, because "No one would be as qualified as
> [Higdon] to make that judgment."[115]

Plaintiff's contention, however, is misleading both in substance and spirit.

As an initial matter, plaintiff misrepresents the FMV Provision. It

does not require that the Fair Market Value *be* based upon an independent

appraiser; rather, the provision sets forth the *definition* of Fair Market Value in a

section exclusively devoted to listing and defining key Plan terms.  The FMV

Provision explains that 'Fair Market Value' refers to Company Stock prices "as

*determined by the Committee* for all purposes under the Plan *based upon* a

---

[114]     Pl. Mem. at 21.

[115]     6/25/10 Plaintiff's Letter.

28

valuation by an independent appraiser."[116]  Hence, the FMV Provision is merely

descriptive, not actionable.  Because it does not set forth any fiduciary duties, it

cannot be the basis for liability for any perceived breach thereof.

Even assuming, *arguendo*, that the FMV Provision does prescribe

procedural rules for evaluating Company Stock, it explicitly reserves discretion to

the Committee to make the final determination of its Fair Market Value.[117]  By the

terms of the FMV Provision, a valuation by an independent appraiser need only

*inform* the Committee's decision; not preordain it.  As such, the Committee

properly invoked an independent appraisal as the basis for the Fair Market Value

asserted as of June 30, 2008 — notably, the Company Stock price reflected exactly

the quantitative recommendation set forth in Houlihan Lokey's June 30, 2008

Valuation Report.

Moreover, even accepting plaintiff's interpretation of its terms, a

violation of the FMV provision could not sustain his breach of fiduciary duty

claim.  To establish liability for breach of fiduciary duty under ERISA, there must

be a causal connection between the alleged breach of a duty imposed upon a

---

[116]    ESOP at 6 (emphasis added).

[117]    Section 15 of the Plan governs its Administration, and vests the Committee with "all the powers necessary to . . . determin[e] the Fair Market Value of Company Stock." *Id*. at 29.

fiduciary and the loss to the plan.[118]  Plaintiff argues that defendants improperly

relied on the June 30, 2008 valuation as the benchmark for the June 2009

distribution because interim changes at the Company demanded a new valuation.

Yet the FMV Provision addresses the *process* for determining fair market value,

not the circumstances compelling an off-calendar valuation.  Thus, defendants'

compliance with plaintiff's view of the FMV Provision would not have averted the

ultimate harm.

> *Second*, plaintiff argues that defendants did not follow the terms of the

Plan because "the Committee's fiduciary duties, as laid out in the Plan document,

include 'selecting an independent appraiser and determining the Fair Market Value

of the Company Stock on such dates as it determines to be ***necessary or***

***appropriate.***'"[119]  Plaintiff's claim is belied by the very terms he chooses to

emphasize.  Plaintiff argues that defendants were required to undertake a new

valuation, but the Plan — and the cited provision — is unequivocal in its

---

[118]    *See, e.g., Salovaara v. Eckert*, No. 94 Civ. 3430, 1998 WL 276186, at *4 (S.D.N.Y. May 28, 1998) ("[B]oth loss to the fund, and a causal connection between that loss and defendant's breach, are necessary elements of an ERISA claim for damages under 29 U.S.C. § 1109(a)."); *Hecht v. Colorboard Packaging Corp.*, 856 F. Supp. 184, 190 (S.D.N.Y. 1994) (dismissing plaintiffs' ERISA claims for breach of fiduciary duty because they failed "to prove the necessary connection between the trustee's breach of fiduciary duty and actual losses incurred by the pension plan").

[119]    Pl. Mem. at 21 (citing ESOP, at 30 (emphasis added)).

30

commitment of interpretive and administrative discretion to the Committee.  It

vests the Committee with the "sole and exclusive  authority to construe, interpret,

and apply the terms of the Plan," and underscores that "[t]he Committee shall be

given the greatest possible deference permitted by law in the exercise of such

discretionary authority."[120]  Indeed, the excerpt cited by plaintiff, which he

represents as an exposition of the Committee's obligations, actually appears as part

of a list enumerating all the Plan provisions over which the Committee has total

power.[121]

> Thus, plaintiff's claim that defendants did not comply with the terms

of the Plan is entirely unavailing.  The remaining issue is therefore whether

adherence to the Plan documents was consistent with defendants' other fiduciary

duties under ERISA — namely, the duties of loyalty and care.

### B.    Duty of Loyalty

> The duty of loyalty requires fiduciaries to exclusively consider, and

act in furtherance of,  the interests of beneficiaries.  Plaintiff argues that defendants

breached this duty by undervaluing Class members' ESOP accounts, and depriving

them of the full distribution to which they were entitled.  Plaintiff's implicit

---

[120]    ESOP at 30.

[121]    *See id.* at 29.

31

assumption — that a new appraisal would have yielded higher returns — is unsubstantiated. Plaintiff points to the results of the June 2009 valuation as evidence that the Company Stock was worth more than the Class received. Yet the undisputed record indicates that Houlihan Lokey initially concluded that the Company Stock was speculative and set a value of zero, but that Higdon objected to this valuation and asked Houlihan Lokey to reconsider.[122] Consequently, Houlihan Lokey employed a new valuation method that had never before been applied to Capital Mercury, and returned a potential range of value from zero to $0.259 per share.[123] Any fair market value extracted from the range would be legitimate, thus allowing the possibility that Company Stock could appropriately be rendered worthless.[124] To the extent that Participants received a greater return on their ESOP accounts based on the June 30, 2009 distribution, they did so because Higdon — charged under the terms of the Plan with determining the ultimate fair market value — chose a number in the midpoint of the range.

---

[122]    *See* Higdon Dep. at 150:23-151:07; 151:19-152:02 ("I objected to the draft I received [because] I did not agree with a zero valuation even though a zero valuation was entirely perfect for me to get out of this lawsuit, but I did not feel that it was the correct value."). *Id.* at 151:22-152:02.

[123]    *See* June 2009 Valuation Report at 43.

[124]    *See* Strassman Dep. at 141:01-07 ("[I]n light of the indications that [Houlihan Lokey] had and the facts and circumstances, we were comfortable that the value was somewhere in that range.").

32

Plaintiff's claim that the Class was "cheat[ed]" by defendants is wholly without merit.[125]

In any event, speculation about the possible results of an interim valuation between June 30, 2008 and June 30, 2009 is incidental to the issue of whether defendants breached their duty of loyalty.  The propriety of fiduciary action is not dependant on its outcome, but on its purpose — fiduciaries are not required to be prescient or infallible in their decision-making, but to exclusively pursue the interests of beneficiaries.  Thus, so long as defendants used the June 30, 2008 valuation for the distribution because it reasonably appeared to maximize returns for Plan participants under then-prevailing circumstances, they were justified in doing so.[126]

There can be no question that reliance on the June 30, 2008 valuation seemed to best serve Participant interests.   Plaintiff proposes that a new valuation

---

[125]     Pl. Mem. at 18.  In any event, because the Company Stock value could have been set at zero under Houlihan Lokey's June 30, 2009 analysis, there is no injury resulting from defendants' actions. *See supra* n.118.  As a result, plaintiff would be unable to recover damages under ERISA even upon a successful showing of defendants' breach of fiduciary duty.

[126]     Moreover, Participants are explicitly instructed that the Plan imposes risks and that their accounts may lose value. *See* ESOP SDP at 1. *See also Gearren v. McGraw-Hill Companies, Inc.*, 690 F. Supp. 2d 254, 265 (S.D.N.Y. 2010) ("ESOPs, unlike pension plans, are not intended to guarantee retirement benefits, and indeed, by its very nature an ESOP places employee retirement assets at much greater risk than does the typical diversified ERISA plan.").

was required to give Participants the full fair market value of their accounts. Yet based on the cost in previous years, a new valuation would run at least twenty thousand dollars — practically a third of the Company's total value at the time.[127] The act of pursuing a new valuation would thus endanger the Company's survival and thwart the very reason it was undertaken in the first place.  Indeed, even without factoring in the expense, it was already unclear whether the Company could survive during the months it would take to complete a new valuation.

      Moreover, in order to promote ERISA's goal of protecting employee benefits, the statute explicitly charges fiduciaries with "defraying reasonable expenses of administration" as part of the duty of loyalty.[128]  Incurring over twenty thousand dollars in expenses for a new valuation, only months before the regularly scheduled valuation was set to take place, would run counter to defendants' statutory duty to defray  administrative expenses.  Thus, defendants acted in accord with their fiduciary duty of loyalty in using the June 30, 2008 valuation as the basis for the distribution of Class members' interests.

### C.    Duty of Prudence

Plaintiff argues that the duty of prudence required defendants  to

---

[127]    *See supra* nn.27, 38 and accompanying text.

[128]    29 U.S.C. § 1104(a)(1)(A)(ii).

"obtain[] a current fair market value of the Company before cashing out [the]

class."[129]  In support of his claim, plaintiff presents the following three undisputed

facts:[130]

> (a) Defendants were taking the . . . step of terminating the
> interests of the majority of the Company's shareholders who
> were former employees;[131] (b) the Company's financial
> condition had clearly changed as a result of the Paris
> transaction; and (c) the fair market valuation relied on by
> Defendants was 9-12 months old as of March and June
> 2009, respectively.[132]

The relevant question is whether these facts objectively support defendants'

decision to use the June 30, 2008 valuation for the June 2009 distribution.  Because

it is unfair to assess the reasonableness of defendants' conduct from the "vantage

point of hindsight," I will consider only the information available to them at the

time.[133]

Defendants decided to distribute Class members' interests in March

---

[129]   Pl. Mem. at 23.

[130]   While the substance of these facts is undisputed, as plaintiff alleges,
the parties perceive their implications differently in accord with their respective
claims.

[131]   I omitted the word "drastic" from the sentence, because it may
constitute a value judgment that cannot be properly represented as an undisputed
fact.

[132]   *Id.*

[133]   *Katsaros*, 744 F.2d at 279 (quotations and citations omitted).

2009, and began to complete the necessary paperwork soon thereafter.  At the time, Capital Mercury was, by all accounts, perilously close to liquidation.  Although the Company was negotiating a sale of assets with Paris,  no deal had yet been confirmed.  The Company's future was thus uncertain — it could imminently be forced into bankruptcy; saved by an agreement with Paris; or restructured as an entirely new corporate entity.  Defendants may have had reasoned beliefs about which of these (or other) scenarios was most probable, but they had no guarantees.

They did, however, have concrete information about the valuation process for determining the fair market value of Company Stock.  They knew from years of experience that a new appraisal would take months to complete, and that a final report could not feasibly be issued before the next scheduled Allocation Date of June 30, 2009.  They were also aware that the previous valuation had been finalized only three or so months earlier,[134] and that the Plan allowed (if not mandated) distributions to be valued as of the preceding June 30.

Under these circumstances, it was prudent to use the June 30, 2008

------

[134]    Plaintiff argues that defendants relied on a "stale" fair market value because it was established at least six months earlier.  Pl. Mem. at 3. In doing so, plaintiff fails to appreciate the length of time required to obtain a new valuation. Houlihan Lokey typically produced the final report of the fair market value as of the Allocation Date in December or January — *i.e.*, six or seven months later. *See* Def. 56.1 ¶¶ 41-41, 66.  Defendants' reliance on a six to nine month old valuation was thus not only reasonable, but expected, under standard industry practices.

valuation to distribute Class members' interests in the Plan.  Plaintiff argues that "the prudent course of conduct would have been to wait for the independent appraisal required by the Plan [in June 30, 2009]."[135]  However, any number of reasons can justify defendants' decision to use the earlier valuation — an interest in ensuring that Inactive Employees received their benefits before the Company was no longer able to provide any benefits; the reasonable possibility that the cost of a new valuation would have devastated the Company; an attempt to ease the administrative burden by eliminating the large volume of small accounts; the impracticability of obtaining a timely new valuation before the next Allocation Date; and the sincere belief that the Plan terms required use of the June 30, 2008 valuation.  Because defendants' decisions were objectively appropriate in light of then-prevailing circumstances, subjective disagreement or speculation regarding their motivations does not render their actions imprudent or unreasonable.

## V.    CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted and plaintiff's cross-motion for summary judgment is denied.  The Clerk of the Court is directed to close these motions [Docket Nos. 24, 31] and this case.

---

[135]    Pl. Mem. at 20.

37

SO ORDERED:

_____
Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            November 9, 2010

**-Appearances-**

**For Plaintiff:**

Michael Adam Schwartz, Esq.
Horwitz, Horwitz & Paradis
405 Lexington Ave, 61st Floor
New York, NY 10174
(212) 986-4500

**For Defendants:**

Jonathan Gary Rose, Esq.
Lisa M. Lewis, Esq.
Sheppard Mullin Richter & Hampton LLP
1300 1 Street, NW
Washington, DC 20005
(202) 218-0000